IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Jennifer Gardner, | ) | C/A No. 4:20-cv-00067-SAL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION & ORDER** |
| | ) | |
| Ethicon, Inc. and Johnson & Johnson, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on a Motion to Substitute Expert Witness, ECF No. 74, filed by Plaintiff Jennifer Gardner ("Plaintiff") and a Motion for Summary Judgment, ECF No. 76, filed by Defendants Ethicon, Inc. and Johnson & Johnson ("Defendants"). For the reasons set forth below, the court denies both motions.

## BACKGROUND AND PROCEDURAL HISTORY

This is one of many products liability cases around the country arising from injuries allegedly caused by implantation of transvaginal surgical mesh. It came to this court on remand from the United States District Court for the Southern District of West Virginia multidistrict litigation ("MDL"), *In re Ethicon, Inc., Pelvic Repair Systems Products Liability Litigation*, 2:12-md-2327, after pretrial proceedings. [ECF Nos. 33, 40.]

Plaintiff in this case brought suit in the MDL on February 27, 2013, naming Ethicon, Inc. and Johnson & Johnson as Defendants. [ECF No. 1.] Her suit stems from a July 18, 2007 procedure in Lancaster, South Carolina during which she was implanted with a Prolift device and a TVT-SECUR ("TVT-S") for the treatment of pelvic organ prolapse and stress urinary incontinence. *Id.* Following the procedure, Plaintiff claims to have suffered "incontinence, infections, pelvic pain, vaginal pain and numbness in her right leg," as well as "exacerbated anxiety" and

"embarrassment." [ECF No. 76-2 at p.6.] Because of the alleged "incontinence, infections, pelvic pain, vaginal pain and numbness in her right leg," Plaintiff underwent a revision procedure on August 28, 2009. *Id.* This lawsuit followed.

Following transfer from the MDL, on March 4, 2020, the court held a Rule 16 conference to discuss the status of the case and to create a schedule for the remainder of the case up to trial. [ECF No. 58.] The parties filed a joint stipulation to dismiss certain claims,[1] and the court entered a consent amended scheduling order reflecting a date-certain trial to begin September 21, 2020. [ECF Nos. 61, 63.]

On April 21, 2020, Defendants filed a motion for leave to file a supplemental motion for summary judgment, and the court granted leave. [ECF Nos. 68, 75.] Defendants filed the supplemental motion on June 11, 2020. [ECF No. 76.] Plaintiff filed an opposition, ECF No. 78, and Defendants filed a reply, ECF No. 81. Accordingly, the supplemental motion for summary judgment is ripe for consideration by this court.

Additionally, three months after the Rule 16 conference, on June 5, 2020, Plaintiff filed a motion to substitute expert witness. [ECF No. 74.] Plaintiff seeks to substitute Dr. Daniel Elliott for Dr. Valdimir Iakovlev. Defendants opposed the motion, ECF No. 77, and the court held a hearing by videoconference on August 19, 2020, ECF No. 142. This matter is also ripe for consideration by this court.

## LEGAL STANDARDS

There are several legal standards at issue here. To address Plaintiff's motion to substitute expert, the court considers two: Rule 16(b)(4), FRCP and Rule 37(c), FRCP.

---

[1] Plaintiff's claims for design defect under strict liability and negligence theories remain.

2

## I. Rule 16(b)(4), FRCP: Good Cause.

When a party seeks to substitute an expert after the passing of the scheduling order deadline, courts apply "the standard for modifying a scheduling order set forth in Rule 16(b) of the Federal Rules of Civil Procedure." *Donegan v. Enerco Grp., Inc./Mr. Heater*, No. 3:18-CV-34, 2019 WL 1571283, at *2 (N.D. W. Va. Feb. 22, 2019) (citing *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 75 F. Supp. 3d 94, 98 (D.D.C. 2014)). Rule 16(b) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

"Good cause requires the party seeking relief to show that the deadlines cannot reasonably be met despite the party's diligence." *Cook v. Howard*, 484 F. App'x 805, 815 (4th Cir. 2012) (internal citations and quotations omitted). It is "not [] satisfied if the district court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule." *Id.* Further, "the absence of prejudice to the opposing party is not equivalent to a showing of good cause." *Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-cv-505, 2018 WL 1248159, at *7 (E.D. Tenn. Mar. 9, 2018). "'[I]f the movant has not been diligent . . . then other factors—including the presence or absence of prejudice to the other party—generally will not be considered." *Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 152 (4th Cir. 2020) (citation omitted).

In this District, "[w]ith respect to expert witness substitutions," courts have found "good cause for belated substitution where a party promptly informs the court that a previously identified expert cannot serve due to illness, injury, or other unanticipated event." *Smith v. Reynolds Transp. Co.*, No. 3:11-cv-2728, 2013 WL 247714, at *3 n.4 (D.S.C. Jan. 23, 2013). Where there are "no facts suggesting either an unanticipated event . . . or prompt pursuit of relief," the court generally denies the late substitution. *Id.*

## II. Rule 37(c), FRCP: Substantially Justified or Harmless.

Rule 37(c) is an "automatic" discovery sanction. Fed. R. Civ. P. 37(c) advisory committee note, 1993 Amendment; *see also Campbell v. United States*, 470 F. App'x 153 (4th Cir. 2012). It has two exceptions: (1) when the failure to disclose is substantially justified and (2) when the nondisclosure is harmless. *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

In determining whether the nondisclosure is substantially justified or harmless, the Fourth Circuit suggests weighing the factors in the following five-factor test:

(1) the surprise to the party against whom the evidence would be offered;
(2) the ability of that party to cure the surprise;
(3) the extent to which allowing the evidence would disrupt the trial;
(4) the importance of the evidence; and
(5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at 597. The first four factors "relate mainly to the harmlessness exception, while the remaining factor—explanation for the nondisclosure—relates primarily to the substantial justification exception." *Id.* "The burden of establishing these [five] factors lies with the nondisclosing party." *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

## III. Rule 56, FRCP: Summary Judgment.

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes this threshold demonstration, the non-moving party may not rest upon mere allegations or denials averred in the pleading, but rather must, by affidavits or other

4

means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56; *see also Celotex Corp.*, 477 U.S. at 323.

A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A litigant is unable to "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1996).

"In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. American Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996).

## ANALYSIS

As noted above, there are two ripe motions present before the court: (1) Plaintiff's motion to substitute expert and (2) Defendant's motion for summary judgment. Because Defendants' motion for summary judgment could be dispositive of the case, the court addresses it first.

## I. Defendants' Motion for Summary Judgment.

Defendants make one argument on summary judgment—Plaintiff's case-specific expert does not identify a reasonable alternative design to the Prolift or TVT-S that would have prevented or reduced *Plaintiff's injuries*. [ECF No. 76.] According to Defendants, this lack of case-specific testimony is fatal to Plaintiff's design defect claims. *Id.* In response, Plaintiff argues there is

sufficient evidence of a reasonable alternative design for both products at issue. [ECF No. 78-1.] Plaintiff relies on the testimony of her general experts in this regard. *Id.* As outlined below, the court concludes that South Carolina case law does not require case-specific expert testimony linking the reasonable alternative design directly to Plaintiff's injuries.

**A. Design Defect Claims in South Carolina, Generally.**

Plaintiff asserts both negligence and strict liability design defect claims against Defendants. A design defect claim is one of three defects a plaintiff in a products liability lawsuit can allege against a defendant in South Carolina. *See Watson v. Ford Motor Co.*, 699 S.E.2d 169, 174 (S.C. 2010) ("There are three defects a plaintiff in a products liability lawsuit can allege: 1) a manufacturing defect, 2) a warning defect, and 3) a design defect."). "When a design defect claim is made, a plaintiff alleges that the product at issue was defectively designed, thus causing an entire line of products to be unreasonably dangerous." *Id.*

"Liability for a design defect may be based on negligence, strict tort, or warranty." *Madden v. Cox*, 328 S.E.2d 108, 112 (S.C. Ct. App. 1985). Regardless of the theory, however, a plaintiff must establish three things: "(1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." *Id.*[2] As to the third element, which is of particular importance to the

---

[2] "A negligence theory imposes the additional burden on a plaintiff 'of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault.'" *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 9 (S.C. 2010) (citing *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995)). As noted in *Branham*, "[t]he fault-based element is of no moment" if "there is no showing in the first instance of a product in a defective condition unreasonably dangerous to the user." *Id.* Here, Defendants' summary judgment argument focuses on the "unreasonably dangerous" element.

motion pending before this court, a plaintiff "must show that the design of the product caused it to be 'unreasonably dangerous.'" *Branham v. Ford Motor Co*., 701 S.E.2d 5, 13 (S.C. 2010) (citing *Madden*, 328 S.E.2d at 112).

### B.  Risk-Utility Test.

In the seminal case of *Branham v. Ford Motor Company*, the South Carolina Supreme Court held that as part of the third element, *i.e.*, proving the product is "unreasonably dangerous," "the plaintiff must present evidence of a reasonable alternative design." *Id.* at 16.  In doing so, it formally adopted the risk-utility test as the "exclusive test in a products liability design case." *Id.* at 14; *see also Miranda C. v. Nissan Motor Co., Ltd*., 741 S.E.2d 34, 39 (S.C. Ct. App. 2013) (recognizing the risk-utility test as the "sole test for proving a design defect").  The court concluded that "in design defect cases the risk-utility test provides the best means for analyzing whether a product is designed defectively." *Branham*, 701 S.E.2d at 15.  Its "focus" "centers upon the alleged defectively designed product." *Id.*

Following *Branham*, a plaintiff is "required to point to a design flaw in the product and show how his alternative design would have *prevented the product from being unreasonably dangerous*." *Id.* at 16 (emphasis added).  "This presentation of an alternative design must include consideration of the costs, safety and functionality associated with the alternative design." *Id.* at 16–17.  If a plaintiff puts forth evidence of a reasonable alternative design, "[t]he analysis asks the trier of fact to determine whether the potential increased price of the product (if any), the potential decrease in the functioning (or utility) of the product (if any), and the potential increase in other safety concerns (if any) associated with the proffered alternative design are worth the benefits that will inhere in the proposed alternative design." *Id.* at 17 n.16.

7

If a plaintiff fails to come forward with evidence of a reasonable alternative design, however, the defendant is entitled to judgment as a matter of law. *See, e.g., Holland ex rel. Knox v. Morbark, Inc.*, 754 S.E.2d 714, 720 (S.C. Ct. App. 2014) ("[T]he circuit court properly considered *Branham* when it found Holland failed to provide evidence of a reasonable alternative design sufficient to withstand summary judgment."); *Holst v. KC/Konencranes Intern. Corp.*, 699 S.E.2d 715, 719 (S.C. Ct. App. 2010) ("[T]o survive summary judgment, it is crucial that a plaintiff also demonstrate that a feasible, workable, design alternative exists under the circumstances." (citing *Disher v. Synthes (U.S.A.)*, 371 F. Supp. 2d 764, 771 (D.S.C. 2005))).

### C. Application of *Branham*: Is Case-Specific Proof Required?

In this case, Defendants argue that Plaintiff must link the reasonable alternative design to Plaintiff's injuries. Specifically, Defendants argue that they are entitled to judgment as a matter of law because "Plaintiff does not have any *case-specific expert opinion* that a safer alternative design existed for the Prolift or TVT-Secur devices that would have prevented or reduced [Plaintiff's] injuries." [ECF No. 76-1 at p.6 (emphasis added).] In response, Plaintiff does not dispute that her case-specific expert fails to provide evidence of a reasonable alternative design. [ECF No. 78-1.] Instead, she relies on her general liability experts, arguing that they opine on "a feasible alternative design . . . that would have been less dangerous and reduced the risk of injury to women *like* Plaintiff." *Id.* at p.17 (emphasis added). Thus, summary judgment in this case turns on whether *Branham* requires a plaintiff to connect the reasonable alternative design to her specific injuries. The undersigned concludes that it does not.

*Branham* is clear: A plaintiff must (1) "point to a design flaw in the product"; (2) "present evidence of a reasonable alternative design"; and (3) "show how [the] alternative design would have prevented the product from being unreasonable dangerous." 701 S.E.2d at 16. Nowhere

does it say that the plaintiff must present evidence that the proposed reasonable alternative design would have prevented the product from causing his or her specific injuries.

Instead, "[t]o prove a reasonable alternative design," a plaintiff is only "required to set forth *some evidence of* an 'alternative design,' which necessarily include[s] the 'consideration of costs, safety, and functionality associated with the alternative design.'" *Holland*, 754 S.E.2d at 720 (citing *Branham*, 701 S.E.2d at 16) (emphasis added). A review of case law from this District evidences that a direct link to Plaintiff's injuries via a case-specific expert is simply not necessary. *See, e.g., Smith v. Brewco, Inc.*, No. 5:16-cv-1288, 2018 WL 1240279, at *6 (D.S.C. Mar. 9, 2018) ("At the very least, where Durig presents an alternative design for the trim saw that includes written instructions on the 'lockout, tagout' procedure . . . Smith has fulfilled his burden of presenting a reasonable alternative design that satisfies the risk-utility test in *Branham*."); *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 709 (D.S.C. 2019) (citing *Branham* as requiring a plaintiff "to point to a design flaw in the product *and* show his alternative design would have prevented the product from being unreasonably dangerous");[3] *Wickersham v. Ford Motor Co.*, 194 F. Supp. 3d 434, 440 (D.S.C. 2016) ("Where, as here, the plaintiff is able to identify a specific design approach that has been implemented elsewhere in the industry . . . , the plaintiff has presented sufficient

---

[3] *Funderburk* involved a motion to exclude or limit testimony of the plaintiff's liability experts. The court concluded that "a 'hypothetical scenario' is a necessary showing under South Carolina law, a legal regime affirmatively mandating proof of an alternative design, for defective design claims." *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 712 (D.S.C. 2019). While it did not make any conclusions regarding whether case-specific expert testimony is needed to link the proposed alternative design to a plaintiff's injuries, its conclusion that the requirement of a reasonable alternative design results in a hypothetical showing certainly suggests that such a link is not required under *Branham*. *See id.* ("[T]he very nature of requiring a showing of an alternative design necessarily implicates a hypothetical inquiry in and of itself, but courts are nevertheless guided by notions of feasibility or reasonableness when evaluating the proposed alternative design, which thereby limits the amount of conjecture and speculation that is permitted by a proposed alternative design.").

evidence of a feasible alternative design to survive summary judgment."); *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 496–97 (D.S.C. 2001) ("Plaintiff has provided an affidavit of Dr. Farone suggesting numerous technologies which in his opinion could have been utilized by Defendants to provide a safer cigarette since the early 1960's at the latest. . . . This affidavit suggests that Plaintiff will introduce evidence of safer alternative designs and thus, Plaintiff has raised a question of fact sufficient to survive summary judgment.").

Stated differently, the risk-utility test relates to the defectiveness of the design—not causation. *Branham*, 701 S.E.2d at 16 ("In every design defect case the central recurring fact will be a product that failed causing damage to a person or his property. Consequently, the focus will be whether the product was made safe enough. This inquiry is the core of the risk-utility balancing test[.]"); *see* 2 David G. Owen & Mary J. David, *Owen & Davis on Products Liability* § 11:11 (4th ed. 2014) ("Like defectiveness and damages, causation must be established by adequate evidence, and this burden is upon the plaintiff."); *id.* at § 8:2 (referencing risk-utility and noting that "[a]ll courts judge the adequacy of a product's design upon one of two basic standards"); *id.* at § 8:10 (concluding "design defectiveness is usually best resolved by risk-utility analysis"); *Mullins v. Ethicon, Inc.*, No. 2:12-cv-2952, 2016 WL 7197441, at *5 (S.D. W. Va. Dec. 9, 2016) ("Whether a product's design is defective is an inquiry separate from causation."). The supplemental authority submitted by Defendants emphasizes this distinction between proof necessary for causation and proof necessary for defectiveness. [ECF No. 146].

Defendants submitted a copy of an opinion from the Eastern District of Missouri, *Abt v. Ethicon, Inc. et al.*, No. 1:20-cv-0047, which granted summary judgment in their favor. *Id.* According to Defendants, the *Abt* court " addressed a similar failure of case-specific expert proof and rejected reliance on general causation experts to meet plaintiff's burden." *Id.* Having

reviewed *Abt*, this court agrees that the court addressed "case-specific expert proof," but notes that it did so in the context of *causation*.

In *Abt*, Defendants argued that the plaintiff "lacks evidence that a design defect in the TVT-O *caused her injuries*." [ECF No. 146-1 at p.6 (page 5 of the opinion; emphasis added).] The court looked to two expert opinions, one from Dr. Bruce Rosenzweig and one from Dr. John Brennan. *Id.* at p.7. In that case, Dr. Rosenzweig was a general causation expert and Dr. Brennan was the specific causation expert. *Id.* The court reviewed Dr. Brennan's report and concluded that "[n]owhere in Dr. Brennan's report does he connect a design defect with Abt's injuries." *Id.* "He provided no specifics such as what design defect caused what injuries, or how any design defect caused Abt's injuries." *Id.* It found that Dr. Brennan "failed to tie an alleged design defect to the injury, which Missouri law requires," and it granted summary judgment in favor of Defendants. *Id.* at p.8.

The distinction between Defendants' argument here and the causation issue in *Abt* is an obvious one. *Abt* found lack of case-specific proof of causation. Defendants here, in contrast, seek summary judgment for lack of case-specific proof on design defectiveness; more specifically, South Carolina's risk utility test with its requirement of showing a reasonable alternative design to prove a design defect. Thus, while the undersigned agrees with *Abt* that a plaintiff's failure to put forth evidence of specific causation—that which ties the design defect to the plaintiff's injury—would be fatal to her claim, that is simply not the issue before this court.

As to the issue before it, the court finds the recent case out of the District of Maryland more analogous than *Abt*. *See Thompson v. Ethicon, Inc*., No. 19-cv-3159, 2020 WL 3893252 (D. Md. July 10, 2020). There, Defendants raised the same issue presented here: the plaintiff's case-specific expert, *i.e.*, the one "who provides the required link in the chain between the alleged defect

in the mesh and the injury," did not provide the "testimony about the safer alternative designs." *Id.* at *5. The court concluded that "the testimony of the general expert witnesses is sufficient to establish defect by meeting the requirements of the risk-utility test[.]"[4] *Id.* The undersigned agrees with *Thompson*. The fact that Plaintiff's case-specific expert does not testify to reasonable alternative design is not fatal to her design defect claims.

Now, that is not to say that the reasonable alternative design does not have to have any relationship to the alleged injuries. Looking back to the elements of a products liability claim, specifically the third element, the plaintiff must show that "the injury occurred because the product was in a defective condition unreasonably dangerous to the user." *Madden*, 328 S.E.2d at 112. Necessarily then, any reasonable alternative design must reduce or remedy the "injury" that occurred as a result of a "defective condition" that was "unreasonable dangerous to the user." *Id.* This connection has been described by at least one court in this District as requiring a "Plaintiff to prove that there is an alternative reasonable design that would have reduced or prevented the *risk of* Plaintiff's injury[.]" *Hickerson*, 2016 WL 4073088, at *2. This is certainly logical. Evidence of a reasonable alternative design that has no relationship to the risk created by the allegedly "defective condition" would be irrelevant.

In sum, the court disagrees with Defendants' argument that Plaintiff must present case-specific expert testimony linking the reasonable alternative design to her injuries. Rather, the *Branham* court was clear: "The plaintiff will be required to point to a design flaw in the product and show how his alternative design would have prevented the product from being unreasonably dangerous." 701 S.E.2d at 16. Plaintiff may rely on her general experts to identify the "design flaw" and the

---

[4] *Thompson* was decided under Maryland law. Maryland, like South Carolina, applies the risk-utility test for design defectiveness.

"alternative design" that would have prevented the product from being unreasonably dangerous, as required by *Branham*.[5]  *See Hulsizer v. Magline, Inc*., No. 4:17-cv-00415, 2018 WL 5617873 (D.S.C. Oct. 29, 2018) ("[T]he Court's duty at the summary judgment stage is to consider *all* the evidence before it . . . and determine whether any question of fact exists regarding the risk-utility test.").Defendants' motion for summary judgment is denied.

## II.  Plaintiff's Motion to Substitute Expert Witness.

Plaintiff's motion asks for alternative relief.  Plaintiff first asks the court to allow her to substitute Dr. Elliott for Dr. Iakovlev, using Rule 16(b)(4), FRCP.  [ECF No. 74]  Alternatively, if the court concludes that she fails to meet Rule 16(b)(4)'s "good cause" standard, Plaintiff asks the court to find that Rule 36(c), FRCP's automatic exclusion rule does not prohibit her from using Dr. Elliott's expert report and testimony at trial.

At the start of the hearing, the court informed the parties of its conclusion that Plaintiff's motion failed to establish good cause required by Rule 16(b)(4), FRCP to substitute the experts.[6]

---

[5] Defendants did not argue that the general experts failed entirely to assess costs, safety, or functionality of the alternative design; instead, they argued the three factors were not assessed "*in relation to* Ms. Gardner."  [ECF No. 81 at p.6 (emphasis added).]  As outlined above, the court concludes that the three factors are required under *Branham*, but not necessarily "in relation to" Plaintiff.

[6] In this case, the only explanation provided by Plaintiff's counsel for naming Dr. Iakovlev when she should have named Dr. Elliott was "the sheer volume of cases being simultaneously worked up as part of Wave 8"—attorney oversight.  [ECF No. 74 at p.2.]  Plaintiff's counsel fails to offer any explanation for the delay between naming the wrong expert in June 2018, and moving to substitute the expert in June 2020.  In any event, courts have universally held that neither carelessness nor attorney oversight serve to establish good cause.  *See, e.g., Kinney v. Holiday Companies*, No. 3:07-cv-0147, 2008 WL 11396748, at *3 (D. Alaska Sept. 25, 2008) ("Plaintiff's failure to plead this claim for relief in her original complaint can only logically be characterized as an oversight, and the Ninth Circuit has held that 'carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief' under Rule 16(b)(4)."); *Morden v. XL Specialty Co*., 315 F.R.D. 676, 680 (D. Utah 2016) ("Good cause . . . does not exist where a party fails . . . due to an error of law or fact, a strategic decision, or a mere oversight."), *aff'd sub nom. Morden v. XL Specialty Ins*., 903 F.3d 1145 (10th Cir. 2018); *QBE Ins. Corp. v. Jorda Enters., Inc*., No. 10-cv-21107, 2012 WL 12844302, at *2 (S.D. Fla. Aug. 6, 2012) ("Lack of diligence

The court confirms this conclusion here.  Therefore, to the extent Plaintiff seeks to substitute experts, the motion is denied.

Further, the court informed the parties that because Plaintiff's sole reason for the incorrect designation did not constitute good cause, it similarly did not constitute "substantial justification" required to avoid Rule 37's automatic exclusion rule.[7]  The only question remaining for this court is whether the late identification of Dr. Elliott is "harmless," such that Plaintiff may be allowed to present Dr. Elliott to testify at trial.  *See* Fed. R. Civ. P. 37(c) (outlining two exceptions to automatic exclusion, "the failure was substantially justified or is harmless").

### A.  Relationship Between Rule 26 and Rule 37.

Before addressing the specific arguments on harmlessness, it is important to note the relationship between Rule 26 and Rule 37.  Rule 26(a) requires a party to disclose expert witnesses it may use at trial.  Fed. R. Civ. P. 26(a)(2)(A).  The "disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony[.]"  Fed. R. Civ. P. 26(a)(2)(B).  Moreover, a party must make "these disclosures at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).

---

does not qualify as excusable neglect or good cause."); *Rogers v. Hartford Life and Acc. Ins. Co.*, No. 12-cv-0019, 2012 WL 2395194, at *2 (S.D. Ala. June 22, 2012) ("[A]uthorities are legion for the proposition that attorney inadvertence, carelessness or oversight . . . is insufficient, as a matter of law, to constitute 'good cause' under Rule 16(b)(4)."); *Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 121 (W.D. Pa. 2010) ("Likewise, tactical errors and delays by experienced attorneys, such as those made in this action, do not demonstrate that Plaintiffs acted with diligence to this Court.").

[7] Just as attorney oversight is not "good cause" under Rule 16, FRCP, it does not serve as "substantial justification" under Rule 37(c), FRCP.  *See Pauley v. Veterans Admin. Med. Ctr.*, No. 2:06-cv-00577, 2007 WL 9718621, at *2 (S.D. W. Va. Oct. 3. 2007) (recognizing that "mere attorney oversight . . . does not constitute substantial justification under Rule 37(c)," but ultimately concluding that the omission of the disclosures was "harmless under Rule 37(c)" because a conflict of one expert subsequently arose, which "certainly justifies a substitution of experts").

"Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses" and "[a] party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Saudi v. Northrop Grunman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005). Commensurate with the importance of the disclosures, Rule 37(c) provides an automatic sanction if a party fails to comply with Rule 26's requirements. *Southern States*, 318 F.3d at 597 (The "basic purpose" of Rule 37(c)(1) is "preventing surprise and prejudice to the opposing party.").

Rule 37(c) provides that "[i]f a party fails to . . . identify a witness as required by Rule 26(a) . . . the party is *not allowed to use* that . . . witness to supply evidence on a motion, at a hearing, or at a trial[.]" Fed. R. Civ. P. 37(c)(1) (emphasis added). The sanction provides two exceptions. A party may still use the witness to present testimony at trial, if the failure to disclose "was substantially justified or is *harmless*"—the latter is at issue here. *Id.* (emphasis added).

In deciding harmlessness, the court is guided by the first four factors in the Fourth Circuit's five-factor test. *Southern States*, 318 F.3d at 597 (The first four factors "relate mainly to the harmlessness exception, while the remaining factor—explanation for the nondisclosure—relates primarily to the substantial justification exception."); *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) ("The burden of establishing these factors lies with the nondisclosing party."). When the failure relates to expert disclosures, as it does here, the Fourth Circuit "give[s] *particularly wide latitude* to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Saudi v. Northrop Grunman Corp.*, 427 F.3d 271, 279 (4th Cir. 2005) (quoting *Southern States*, 318 F.3d at 595) (emphasis added).

15

**B.  Late Disclosure in this Case: Harmless?**

The identification of Dr. Elliott at this stage of the litigation is unquestionably too late.  On January 30, 2018, the MDL issued a pretrial order limiting each side to no more than five experts per case.  Plaintiff was required to serve her Rule 26(a) expert disclosures by June 4, 2018, and Defendants were required to serve their disclosure by July 5, 2018.  On June 4, 2018, Plaintiff served her expert disclosures, which identified the Dr. Iakovlev, a pathologist, as one of her five experts.  Defendants also served their expert disclosures, which identified Dr. Thomas Wright as their pathologist.  It was not until two years after Plaintiff's deadline that she sought to identify Dr. Elliott as an expert in this case.  [ECF No. 74.]  Therefore, the only way Plaintiff can succeed in getting Dr. Elliott's testimony before a jury is to prove that her late disclosure is harmless.

The four relevant factors for purposes of this analysis are: (1) surprise to Defendants; (2) the ability of Defendants to cure the surprise; (3) the extent to which the evidence will disrupt trial; and (4) the importance of the evidence.  *Southern States*, 318 F.3d at 597.  As to the first factor, Plaintiff argues that Defendants will not suffer any surprise or prejudice because "Defendants have been in possession of Dr. Elliott's report since approximately February 1, 2016," and Defendants already deposed Dr. Elliott "regarding his opinions on the Prolift device."  [ECF No. 74 at p.4.]  Second, Plaintiff argues that the surprise is easily cured by allowing Defendants to substitute one of their own general experts.  *Id.*  As to the third factor, Plaintiff contends that allowing Dr. Elliott to testify will not disrupt trial, which is scheduled to begin September 21, 2020, because "[t]his is not a case in which a party is asking for substitution on the eve of trial."  *Id.*  And, finally, importance of the evidence:  If Plaintiff is not allowed to present Dr. Elliott, she "would be without a key expert to provide causation testimony" on the Prolift device.  *Id.*  For all of these reasons, Plaintiff argues that the late identification of Dr. Elliott is harmless.

Defendants, as one might expect, take a different position entirely. Defendant's arguments surround a similar[8] situation involving the same Plaintiff's counsel and the same experts in the United States District Court for the District of Minnesota, *Rolandson v. Ethicon Inc. et al.*, No. 15-cv-537 (D. Minn.). Defendants emphasize the timing of Plaintiff's request in this case in relation to the events occurring in Minnesota.

*Rolandson*, like the present case, was part of the MDL's Wave 8. That case transferred out of the MDL to the District of Minnesota in late 2019. The Minnesota district court held a status conference on August 27, 2019, during which time Plaintiff's counsel acknowledged that expert reports had already been served in the MDL. Following the status conference, the court allowed additional discovery, but limited that discovery to supplementing expert reports and the taking of depositions of certain medical experts, family, and friends. Thereafter, as is relevant to this case, Plaintiff's counsel "served an entirely new expert report by Dr. Daniel Elliott," claiming it "was inadvertently not produced during the MDL workup of this case." [ECF No. 77-2, *Rolandson* Order at p.5.][9] Defendants moved to strike Dr. Elliott's report. The Minnesota district court ultimately agreed to strike Dr. Elliott's report, noting that Plaintiff's counsel "*unilaterally* disclosed a new expert over a year after the deadline and *in excess of* Plaintiff's allotted experts" and "dissembled, obfuscated or responded combatively" when communicating with Defendants' counsel. *Id.* at p.20 (emphasis added). Recognizing that "leaving Ms. Rolandson entirely without

---

[8] Despite Defendants arguments, this court cannot conclude that events in *Rolandson* are the same as exist here. There are several important distinctions between the two cases. The court need not address all of them here, but suffice it to say that the conduct by Plaintiff's counsel in *Rolandson* was far more egregious than that of Plaintiff's counsel in this case. Importantly, Plaintiff's counsel in *Rolandson* served Dr. Elliott's report in contravention of a court order and without seeking leave of court, failed to attend a noticed hearing, and made "knowingly wrong" representations to the Minnesota court. [ECF No. 77-2, *Rolandson* Order at p.16.]
[9] Dr. Elliott was not named as one of the plaintiff's five experts in the MDL.

an expert to testify on the Prolift device would punish her for the shortcomings of her counsel," the court allowed the plaintiff to use her previously disclosed expert, Dr. Rosenzweig, to testify on the Prolift device.[10]

While the events in *Rolandson* were playing out, this case was being transferred out of the MDL, to this District. This court issued its notice of transfer on January 8, 2020—one day after the Minnesota district court's first scheduled hearing on the motion to strike. [*See* ECF No. 40]; *see also Rolandson* Order at p.9 ("The Court first scheduled arguments on this motion for January 7, 2020."). Then, by the time this court scheduled its March 4, 2020 Rule 16 conference, Plaintiff's counsel had requested, received, and appeared for a second hearing on the motion to strike in *Rolandson*.[11]  *See Rolandson* Order at p.9. Thus, by the time this case came to the undersigned, Plaintiff's counsel was aware, at the very least, that in one additional Wave 8 case, they had identified the wrong expert and were facing a motion to strike because of that error. On April 30, 2020, the Minnesota district court issued its order striking Dr. Elliott's report. Plaintiff—without explanation—waited until *after* the issuance of that order to both consult with counsel on the error in this case and file a motion requesting the appropriate relief.

The court cannot dispute that the timing of *Rolandson*, compared to the proposed substitution of Dr. Elliott in this case, is troubling. However, just as the Minnesota district court noted, this court is similarly constrained to view the harmlessness analysis "solely through the lens of this individual case." *Id.* at p.16. In that regard, at the hearing, Defendants argued that Plaintiff is

---

[10] Dr. Rosenzweig authored a report on the Prolift device outside of the MDL. He also authored a report on a separate device that includes opinions applicable to the Prolift device. *Id.* at p.20.
[11] Plaintiff's counsel failed to appear for the first hearing scheduled in *Rolandson*. *Id.* at p.9.

seeking to swap out experts for strategic reasons, that they chose their experts based on Plaintiff's designations in the MDL, and Plaintiff's counsel continues to lack candor with this court.[12]

Considering Defendants' arguments in line with the four harmlessness factors[13] outlined in *Southern States*, the court finds that they only tangentially relate to surprise and ability to cure—the first and second factors. None of Defendants' arguments specifically address the third and fourth factors, but both parties seem to agree that regardless of the outcome of Plaintiff's motion, the case would be ready to proceed to trial as scheduled. Further, there seems to be no question that the evidence is crucially important to Plaintiff's case.[14]

Based on the foregoing, the court is left with some surprise to Defendants, the Defendants' ability to cure the surprise (but not without some additional effort not contemplated by the MDL's pretrial order), a trial that should proceed as scheduled, and the possibility that Plaintiff will be left without a crucial piece of evidence to support her case. As a result, while it may be *de minimis*, the court cannot conclude that allowing Dr. Elliott to testify at trial will be harmless. Instead, the court finds that the harm is two-fold. First, if Dr. Elliott is allowed to testify, Defendants would have to make new decisions about their experts on the eve of trial. This last-minute change in experts is harmful to Defendants. Second, the designation of a new expert this late in the game undermines the goal and purpose of the MDL's pretrial proceedings. *See In re Ethicon*, No. 2:12-cv-747, 2016 WL 1621954 (S.D. W. Va. Apr. 21, 2016) (granting a motion to exclude a late-served

---

[12] In this regard, Defendants argue that Dr. Iakovlev is not "unavailable" for trial, as Plaintiff's counsel suggest, and is actually scheduled to appear in a trial as soon as September 2020.

[13] Defendants' emphasis remains on, what can only be described as, bad faith. The only relevance bad faith has to Rule 37(c) is to "the fifth factor of [the *Southern States*] test—the nondisclosing party's explanation for its failure to disclose evidence." *Southern States*, 318 F.3d at 598. Because the fifth factor relates to substantial justification, which is not at issue here, the court finds the bulk of Defendants' arguments misplaced.

[14] As indicated during the hearing, the court is still left wondering how the most important witness was misidentified and that misidentification was not discovered for another two years.

case-specific expert report; "Pretrial orders—and the parties' compliance with those orders and the deadlines set forth therein—'are the engine that drives disposition on the merits.'" (citation omitted)).

The court harkens back to the Honorable Joseph R. Goodwin's emphatic request in the transfer order: "I urge the receiving court to immediately set these cases for trial without reopening discovery. . . . Extensive development of these cases *over a period of years* has made such further action completely unnecessary." [ECF No. 33 at p.1 (emphasis added).] This court, recognizing the importance of the work performed by Judge Goodwin and the parties in the MDL, immediately set this case for trial. This court is now faced with a situation in which Plaintiff's counsel was aware—by at least late 2019—that there was a problem with the general experts identified in her Wave 8 cases. And, despite requests, Plaintiff's counsel fails to offer any explanation for why this issue was not presented to this court until June 2020. Therefore, allowing Plaintiff to present Dr. Elliott at trial would be harmful to the process as a whole.

## C. A Remedy.

The final issue for the court is the fashioning of an appropriate remedy. Having concluded that allowing Dr. Elliott to testify at trial is not harmless, the court must determine whether the automatic sanction provided by Rule 37(c)(1) is appropriate. Given the importance of the evidence to Plaintiff's case and Plaintiff's counsel's efforts to seek leave in this case to remedy the error,[15] the court finds that leaving Plaintiff without a general causation expert on the Prolift device is too harsh a result. While the court will not allow Dr. Elliott to testify at trial, the court will allow Dr.

---

[15] As opposed to unilaterally serving the late expert report as Plaintiff's counsel chose to do in *Rolandson*. However, the court remains unconvinced that Plaintiff's counsel acted with complete candor to this court or to Defendants' counsel. Had Plaintiff's counsel acknowledged the error to this court during the Rule 16 conference or to Defendants' counsel as soon as this case was transferred out of the MDL, all involved would have been in a better position to address the harm.

Rosenzweig, a timely identified expert witness, to testify to his Prolift report that was prepared outside of the MDL, as well as his opinions contained in his current report that are appliable to the Prolift device.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion to Substitute Expert, ECF No. 74, is **DENIED**, and Defendants' Motion for Summary Judgment, ECF No. 76, is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sherri A. Lydon
United States District Judge

August 27, 2020
Florence, South Carolina